UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CHRISTOPHER SCHAEFER,

    Plaintiff,

v.                                                   Case No. 04-C-159

VALSPAR CORPORATION, et al.,

    Defendant.

## DECISION AND ORDER

Plaintiff Christopher Schaefer filed this product liability action nearly nine years after he was last exposed to the substance he claims caused his lung disease. Federal jurisdiction is under 28 U.S.C. § 1332. The case is before me on the defendants' motion for summary judgment which seeks dismissal on the ground that the action is barred by Wisconsin's three-year statute of limitations for personal injury actions. Wis. Stat. § 893.54. For the reasons that follow, the defendants' motion will be denied. Before getting to those reasons, however, I will first set forth the relevant facts. Because the case is before me on the defendants' motion for summary judgment, the facts are viewed in the light most favorable to the plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### I. BACKGROUND

Plaintiff Christopher Schaefer is a forty-four-year-old male suffering from occupational asthma, a lung disorder caused by various agents found in the work place and characterized by attacks of breathing difficulty, wheezing, prolonged exhalation and cough.[1] (Compl. ¶ 17.)

---

[1] *Defined at* http://www.nlm.nih.gov/medlineplus/ency/article/000110.htm#Definition.

Schaefer contracted the ailment while working at Professional Plating, Inc. (PPI), an industrial painting job shop specializing in coating metal components with epoxy, acrylic and enamel paints. (DPFOF 3, 38; Compl. ¶ 17.)[2]

Schaefer was hired by PPI in November 1993 to work on the paint line and as a laboratory technician. (DPFOF 4.) As a laboratory technician, Schaefer was responsible for collecting and testing paint and other samples from various tanks on the paint line. (DPFOF 6,7.) One of the tests Schaefer performed in the laboratory was the "percent solids" test. This test required Schaefer to bake 5-milliliter samples of a particular liquid in an industrial oven at approximately 350 degrees, Fahrenheit, to determine the percentage of paint per water in the solution being tested. (DPFOF 8; Platt Aff., Ex. A at 93-94.)

One of the components of a two-component paint system that Schaefer tested bore the trade name "Cathodic 680 Resin Feed" (680 Resin), which was manufactured by Lilly Corporation, a company acquired by Valspar in 2000. (PPFOF 17,18; Munroe Aff. Ex. J, p. 53.) A component of 680 Resin was a polymer that contained reacted, or "blocked," isophorone diisocyanate. A blocking agent is intended to keep the polymer stable at room temperature. The isocyanate in 680 Resin unblocks, however, at temperatures in excess of 300 degrees.[3] (PPFOF 4, 6.)

---

[2] "DPFOF" refers to Defendants' Proposed Findings of Fact. "PPFOF" refers to Plaintiff' Proposed Findings of Fact.

[3] Isocyanates are compounds containing the isocyanate group (-NCO). They react with compounds containing alcohol (hydroxyl) groups to produce polyurethane polymers.
Health effects of isocyanate exposure include irritation of skin and mucous membranes, chest tightness, and difficult breathing. Isocyanates are classified as potential human carcinogens and are known to cause cancer in animals. The main effects of overexposure are occupational asthma and other lung problems, as well as irritation of the eyes, nose, throat, and skin. *Accessed at* http://www.osha.gov/SLTC/isocyanates/

After working at PPI between one-and-a-half and two months as a laboratory technician, Schaefer began experiencing shortness of breath, wheezing and chest tightness. (DPFOF 14, 15.) On March 24, 1994, Shaefer sought treatment from Dr. Adler-Fisc. (PPFOF 21.) Dr. Adler-Fisc opined that Schaefer probably suffered from bronchitis, an inflammation of the tracheobronchial tree, and pharyngitis, an infection or irritation of the pharynx and/or tonsils.[4] (PPFOF 23.) Schaefer's symptoms persisted, and on November 2, 2004, he sought treatment from Dr. Connelly. Dr. Connelly's diagnosed Schaefer as suffering from bronchopneumonia.

Over the following months, Schaefer's health did not improve and on February 10, 1995 Schaefer sought treatment from a third doctor, pulmonologist Scott D. Nygaard, M.D. Schaefer explained to Dr. Nygaard that while performing tests on certain products in the laboratory, he noted chest tightness, an inability to take deep breaths and occasional coughs, with symptoms lasting from one to four hours. (Monroe Aff., Ex. D.) Based on the history Schaefer provided, Dr. Nygaard suspected that he had reactive airways disorder and that this condition was work related. (DPFOF 18, 19.) Dr. Nygaard asked if Schaefer had been exposed to isocyanates. When Schaefer said he didn't know, Dr. Nygaard instructed him to obtain Material Safety Data Sheets (MSDS)[5] for the materials he worked with at PPI. Dr. Nygaard also suggested that Schaefer record serial peak expiratory flows three times a day to measure his lung function.[6]

---

[4] Definitions of bronchitis and pharyngitis were found, respectively, at http://www.emedicine.com/emerg/topic69.htm and http://www.emedicine.com/emerg/topic419.htm.

[5] A Material Safety Data Sheet (MSDS) is designed to provide both workers and emergency personnel with the proper procedures for handling or working with a particular substance. MSDS's include information such as physical data (melting point, boiling point, flash point etc.), toxicity, health effects, first aid, reactivity, storage, disposal, protective equipment, and spill/leak procedures. *Accessed at* http://www.ilpi.com/msds/faq/parta.html#whatis

[6] Peak expiratory flow (PEF) is a measure of lung function. Monitoring PEF can help an individual and his or her health professional treat asthma. *Accessed at*

3

Approximately three weeks later, on March 2, 1995, Schaefer returned to Dr. Nygaard. Schaefer provided Dr. Nygaard with the available MSDSs, including the 1994 MSDS for the 680 Resin. The MSDSs reviewed by Dr. Nygaard did not disclose the presence of isocyanates in polymer form or otherwise. On the basis of the MSDSs provided, Dr. Nygaard concluded that "there is no apparent isocyanate exposure." (PPFOF ¶¶ 19,28.) The results of Schaefer's peak flows suggested, however, that his condition was caused by occupational exposure and that he probably had occupational induced reactive airways disease. (PPFOF 28; Monroe Aff., Ex. D.) Dr. Nygaard thus advised Schaefer that the best treatment for his condition would be to avoid further exposure to substances which appear to be stimulating his airway. He also discussed the possibility of having an air sampling done in the work environment. (Monroe Aff., Ex. D.)

Within months of the March 2, 1995 meeting with Dr. Nygaard, Schaefer resigned from PPI without requesting or obtaining an air sampling from his employer. Shortly after resigning, Schaefer became employed at Mill's Fleet Farm, a regional wholesale supply store. In 1998, he started work with the Home Depot chain of stores. Despite these changes in environment, Schaefer continued to have breathing and respiratory problems, sometimes of such a severity as to cause him to miss work. (PPFOF 36, 40.) Regardless, Schaefer saw a doctor only twice for his respiratory problems between 1995 and January 2000; once in late 1995 and again in early 1996. (DPFOF 28, 29.)

Between November 1999 and February 2000, Schaefer's symptoms worsened. In early 2000, Schaefer went to the emergency room at St. Mary's Hospital in Green Bay with complaints of a non-to-mildly productive cough, intermittent fever, a mild sore throat and mild shortness of

---

http://my.webmd.com/hw/asthma/tp16418.asp?src=Inktomi&condition=healthwise.

4

breath. (DPFOF 31; PPFOF 41.) He was diagnosed as suffering from bronchitis. (PPFOF 42.) Schaefer was seen twice more at the emergency room for follow-ups to his respiratory problems. By the time he had his second follow-up, on February 13, 2000, Schaefer was experiencing shortness of breath and wheezing, aggravated by lying down and exertional activities. (PPFOF 44.)

Schaefer then saw an allergist on February 17, 2000. Schaefer's chief complaint was ongoing bronchial spasms, with symptoms including coughing, dyspnea, tight chest and wheezing. (PPFOF 46.) The allergist's diagnosis was rhinitis, mild chronic sinusitis and recent viral infection. (PPFOF 49.)

In June 2001, Schaeffer was seen by a second pulmonologist, Dr. Brian Avery. Based upon Schaefer's condition and medical history, Dr. Avery recommended that Schaefer secure MSDSs from PPI. Schaefer did so, providing them to Dr. Avery. After reviewing the MSDSs, Dr. Avery advised Schaefer that one of the products he worked with contained an isocyanate polymer. (DPFOF 38; PPFOF 51.) That product was the 680 Resin. Unlike the 1994 MSDS, the 2000 MSDS for the 680 Resin identified one of the active ingredients as an isocyanate polymer. (PPFOF 19; Munroe Aff., Exs. B,C.) From this information and the history Schaefer provided, Dr. Avery concluded that Schaefer had occupational asthma caused by exposure to isocyanates. (DPFOF 38; PPFOF 51.)

Schaefer subsequently filed a worker's compensation claim against PPI. As part of the investigation into the claim, Dr. Stuart Levy was retained by the worker's compensation insurer to review Schaefer's medical records and examine Schaefer. Dr. Levy's findings were consistent with those described by Dr. Avery. He concluded that the 680 Resin Schaefer worked with at PPI contained an isocyanate polymer and that Schaefer had been exposed to this product while working

5

in the laboratory. (Gustafson Aff., Ex. A.). On the basis of these findings, Schaefer was awarded worker's compensation benefits.

Schaefer then initiated this action against Valspar in the Circuit Court for Winnebago County. Valspar removed the case to federal court based on diversity of citizenship, and the parties stipulated to the addition of Engineered Polymer Solutions, Valspar's wholly owned subsidiary, as a defendant. Valspar and Engineered Polymer Solutions, (collectively "Valspar") now seek dismissal of Schaefer's action on summary judgment on the ground it is barred by applicable statute of limitations.

## II. ANALYSIS

Statutes of limitation are intended to promote fair and prompt litigation and protect defendants from stale or fraudulent claims "brought after memories have faded or evidence has been lost." *Korkow v. General Cas. Co. of Wisconsin*, 344 N.W.2d 108, 115 (Wis. 1984). "Statutes of limitation, which 'are found and approved in all systems of enlightened jurisprudence,' articulate the principle that it is more just to put the adversary on notice to defend a claim within a specified period of time than to permit unlimited prosecution of stale claims." *Aicher ex rel. LaBarge v. Wisconsin Patients Compensation Fund,* 613 N.W.2d 849, 859-60 (Wis. 2000) (*quoting United States v. Kubrick*, 444 U.S. 111, 117 (1979). However, "[s]tatutes of limitations are not hoops to be jumped through; they are rules that promote fair and quick litigation." *Hammack v. DeLonghi, S.p.A.,* 914 F. Supp. 303, 306 (E.D. Wis. 1996).

Wisconsin law provides that an action to recover damages for injuries to the person "shall be commenced within 3 years or be barred." Wis. Stat. § 893.54(1). The three years within which the action must be commenced runs from the time the action accrues. Under Wisconsin law, a claim accrues "when there exists a claim capable of enforcement, a suitable party against whom it

6

may be enforced, and a party with a present right to enforce it." *Pritzlaff v. Archdiocese of Milwaukee,* 533 N.W.2d 780, 785 (Wis. 1995). In most cases, this date is easy to determine. Individuals generally know immediately when they are injured and who did it. Thus, in most cases, "the date of injury and the accrual date are the same." *Hammack*, 914 F. Supp. at 305. The date a claim accrues is more difficult to determine, however, when the plaintiff is not immediately aware of the injury, the cause of injury, or the identity of the person that caused the injury. In cases when the plaintiff reasonably does not know of his or her claim or the identity of the defendant, Wisconsin applies the discovery rule to determine when the claim accrued. *See Hansen v. A.H. Robbins, Inc.*, 335 N.W.2d 578 (Wis. 1986).

Under the discovery rule, a claim accrues when the plaintiff discovers, or in the exercise of reasonable diligence, should have discovered, the claim and the identity of the person against whom it lies, whichever is earlier. *Id.*, 335 N.W.2d at 583; *Borello v. U.S. Oil Co.*, 388 N.W.2d 140, 146 (Wis. 1986). "A plaintiff can rely on the discovery rule only if he or she has exercised reasonable diligence." *Jacobs v. Nor-Lake, Inc.*, 579 N.W.2d 254, 258 (Wis. App. 1998). "Reasonable diligence" means such diligence as the great majority of persons would use in the same or similar circumstances." *Id.*; *Spitler v. Dean*, 436 N.W.2d 308, 311 (Wis. 1989). As Judge Reynolds explained in *Hammack*:

> Reasonable diligence includes those actions a reasonable person, under the same circumstances as the plaintiff, would have taken to discover the defendant's identity. . . . Although plaintiffs must act on the information they have . . . reasonable diligence does not require a superhuman effort or the judgment of an expert. A person exercising reasonable diligence may make mistakes that prolong the search. *E.g. Claypool,* 195 Wis.2d at 550-552, 536 N.W.2d at 211-12 (plaintiff can, in some cases, rely on incorrect judgment of doctor that prolonged discovering the cause of the injury).

7

> Reasonable diligence is missing only when another method of investigation probably would have discovered the defendants' identity sooner.

914 F. Supp. at 306 (citations omitted).

Finally, it should be noted that "[t]he issue of reasonable diligence is ordinarily one of fact." *Jacobs*, 579 N.W.2d at 258. And even if the material facts are not in dispute, summary judgment is improper if more than one reasonable inference can be drawn from those facts. *Id.*

Here, although Schaefer began experiencing symptoms of occupational asthma in 1995, he contends that his claim against the defendants did not accrue until July of 2001, when he was diagnosed by Dr. Avery as having occupational asthma and learned that the 680 Resin contained an isocyanate polymer. Since he filed suit within three years of that time, Schaefer argues that his action is not barred by Wisconsin's statute of limitations.

For purposes of its motion, Valspar does not dispute that Schaefer first learned of the contents of the 680 Resin in 2001. Valspar contends, however, that Schaefer failed to exercise reasonable diligence in discovering this information earlier and, therefore, his claim falls outside the statute of limitations. In Valspar's view, Schaefer failed to use reasonable diligence because he failed to follow Dr. Nygaard's advice by asking his employer to conduct air monitoring in his workplace to determine the identities and amounts of any harmful substances that were present. Had he done so, Valspar contends, Schaefer would have discovered the presence of the isocyanate polymer within the 680 Resin in 1995, almost nine years before he filed this action.

Schaefer, on the other hand, argues that once he obtained the MSDSs for the substances he was testing and Dr. Nygaard told him there was "no apparent isocyanate exposure" (PPFOF ¶ 28), he acted reasonably in terminating his employment with PPI and finding other work instead of

8

pursuing the possible cause of his illness further. He contends that the air monitoring Dr. Nygaard proposed would have determined only if PPI's work place ventilation was sufficient, not whether he had been exposed to isocyanates. Thus, he contends, even if he had requested air monitoring and PPI had agreed to conduct it, it would not have told him that the cause of his problems was the 680 Resin. Moreover, Schaefer argues, once he left PPI, his condition stabilized until late 1999. He then promptly sought medical treatment and diligently pursued treatment until, with the more recent and accurate MSDS for 680 Resin, Dr. Avery was able to determine the cause of his illness. (Pl.'s Br. at 2-3.)

From the record before me, I conclude that the facts are not sufficiently developed to allow me to determine as a matter of law whether Schaefer acted reasonably and whether any alternative means would have revealed the identity of the defendants sooner. Valspar disputes Schaefer's claim that the air sampling Dr. Nygaard suggested would not have determined the presence of isocyanates. Valspar notes that Dr. Nygaard testified at deposition that air sampling can determine the presence of certain particles, as well as the quantity of particles in the air. (Def. Reply Br. at 3.) But Dr. Nygarrd's testimony is less than clear as to whether air monitoring would have been able to identify isocyanates in the work place under the circumstances of this case. More importantly, it is not clear from the record that Dr. Nygaard communicated this to Schaefer. Schaefer's understanding was that it would simply tell him if the ventilation was adequate, and this understanding is consistent with Dr. Nygaard's office note that he discussed with him that he could "consider having air sampling done in the work environment to make sure there was adequate ventilation." (Munroe Aff., Ex. D.) Even if isocyanates could have been detected, it is not clear that their source would have been determined. The evidence suggests the isocyanates were only present upon heat testing of 680

9

Resin. In view of the MSDS stating that 680 Resin did not contain isocyanates, it is difficult to say without more that 680 Resin would have been identified as the culprit.

There is also no evidence on this record that PPI would have conducted air monitoring at Schaefer's request. Even if it would, Dr. Nygaard noted that "[t]his may be inadequate treatment to avoid further symptoms." (Munroe Aff., Ex. D.) Under these circumstances, Schaefer elected to terminate his employment at PPI and did not pursue the cause of his respiratory problems further at that time. Was this reasonable on his part? Probably not if Schaefer realized at that time that he had suffered a permanent injury that would significantly impact his capacity to enjoy life and earn a living. But there is no evidence that Schaefer realized the seriousness of his injury. He claims his condition stabilized until late 1999, and the absence of treatment records from 1995 through 1999 would seem to confirm this fact.

Under these circumstances and without more, I am unable to say as a matter of law that Schaefer acted unreasonably in failing to request air sampling in 1995. Other courts analyzing this issue have found that failure to comply with such a suggestion is not tantamount to unreasonable diligence. In *Hammack*, for example, the plaintiff sued the manufacturer of a portable heater almost five years after a fire destroyed his house and killed his wife and two of his daughters. The defendants moved for summary judgment arguing among other things that the plaintiff did not exhibit reasonable diligence because he failed to heed his attorney's request to go to Wal-Mart and KMART to try and identify the maker of the furnace believed to be the cause of the fire. The court rejected this argument, stating that the record failed to show that going to the aforementioned stores would have been any more diligent than going to the True Value Hardware store, where plaintiff instead went to search for the manufacturer of the heater. 914 F. Supp. at 307-308.

10

The same deficiencies are present in this case. Not only is it unclear that Schaefer understood the basis for his doctor's request, the evidence is less than clear that, even if he had followed his doctor's recommendation, the presence of the isocyanate polymer contained in 680 Resin would have been discovered any sooner. And even if it might have led to an earlier discovery of the source of his problem, it is still less than certain whether under all of the circumstances, the great majority of individuals would have acted differently. "The law requires reasonable diligence, not vulture like expediency." *Hammack*, 914 F. Supp. at 307.

Finally, I note that under the version of facts presented by Schaefer, which are accepted as true for purposes of deciding Valspar's motion, it appears Schaefer's failure to discover the source of his injury earlier was due in part to the false, or at least incomplete, information contained in the MSDS for 680 Resin. The information contained in a MSDS was presumably provided by the manufacturer of the substance, which in this case would have been Lilly, the company Valspar acquired. If that is true, it would be particularly inappropriate to allow Lilly's successor to benefit as a result of Lilly's failure to prepare and distribute a complete and accurate MSDS for its product.

In any event, viewed in the light most favorably to Schaefer, I conclude that the evidence presented does not establish as a matter of law that Schaefer's claim is barred by the three-year statute of limitations. Accordingly, Valspar's motion for summary judgment will be denied.

**SO ORDERED.**

Dated this   21st   day of April, 2005.

> s/ William C. Griesbach
> William C. Griesbach
> United States District Judge

11